**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EPSILON-NDT ENDUSTRIYEL KONTROL SISTEMLERI SANAYI VE TICARET, A.S.** | : | **CIVIL ACTION NO. 3:18-cv-821** |
| | : | **(JUDGE MANNION)** |
| **("Epsilon"),** | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| **POWERRAIL DISTRIBUTION, INC.,** | : | |
| | : | |
| **("PowerRail"),** | : | |
| | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM</u>**

Presently before the court is Defendant's motion for summary judgment. (Doc. 53.) Plaintiff, an industrial equipment provider based in Istanbul, Turkey, brings suit against Defendant, a distributor of after market train parts based in Duryea, Pennsylvania, for *inter alia* breach of contract. In 2015, Plaintiff entered into a Sales Agreement with non-party Rail and Traction Canada ("RTC") to buy train parts for resale to non-party Egyptian National Railways ("ENR"). However, RTC failed to deliver the train parts promised under the agreement, which in turn caused Plaintiff to breach its separate resale agreement with ENR. Plaintiff alleges that Defendant is

ultimately liable for these breaches because it was (1.) the alter ego of RTC, (2.) the principal on behalf of which RTC acted as agent, and (3.) assumed the rights and obligations of RTC under the Sales Agreement. Defendant moves for summary judgment on the basis that Plaintiff has provided no admissible evidence to support these allegations and otherwise has failed to raise a genuine dispute of material fact regarding its other claims.

## I.    Background

On November 30, 2015, Plaintiff entered a contract with ENR to source spare parts and equipment for ENR's fleet of Henschel-branded diesel locomotives. In or around that time Plaintiff contacted RTC, its preferred North American supplier of after market train parts, to procure and deliver that inventory of goods to ENR. Plaintiff and RTC then formed the Sales Agreement by exchange of a firm offer from RTC and a purchase order from Plaintiff accepting the offer. RTC already had 80 of the 95-line items under the Sales Agreement in its inventory at the time the agreement was entered. Pursuant to the terms of the agreement, Plaintiff paid 50% of the order price, or $172,000, in advance, with the remaining 50% to be paid upon presentation of the shipment invoice. Despite this significant advanced

payment, the Sales Agreement did not specify at what point title to the goods purchased under it would pass to Plaintiff.

Throughout 2016 and 2017, ENR experienced delays and difficulties in obtaining the US dollar-denominated letter of credit necessary to effect payment under its separate contract with Plaintiff. Still Plaintiff assured RTC that it remained intent on taking delivery of the goods under the Sales Agreement and agreed that RTC would continue to hold the goods already procured at its warehouse in St. Thomas, Ontario, but would pause any further efforts to procure the remaining items. In April 2017 ENR remained unable to pay for the goods and RTC could no longer hold those goods at its Ontario warehouse, as it was in financial distress that required the liquidation of its assets including its warehouse. Consequently, Plaintiff gave RTC written authorization to find other potential buyers for the goods on April 24, 2017.

On September 18, 2017, Plaintiff assented, in writing, to RTC transferring the goods to Defendant. RTC delivered those goods to Defendant's warehouse in Duryea, Pennsylvania, in early October 2017 and soon thereafter went out of business. Between October and December 2017 Plaintiff communicated with Defendant and acknowledged the latter's possession of the goods. However, it soon became clear that there was a

miscommunication between Plaintiff, RTC, and Defendant. First, Plaintiff believed it owned the goods already procured under the Sales Agreement by RTC, who it further believed was simply holding those goods on consignment until they could be sold. Second, Plaintiff also believed that Defendant bought the goods (which had appreciated in price) from RTC for $180,000 that would be remitted to Plaintiff under its consignment arrangement with RTC. Conversely Defendant believed RTC owned the disputed goods outright and that RTC had sold it those goods free of any obligation to Plaintiff in exchange for forgiving an outstanding trade debt RTC owed Defendant.

In an email to Plaintiff's representative on November 6, 2017, RTC's CEO, Stephane Claveau, acknowledged that there had been a miscommunication in the rush to clear out RTC's Ontario warehouse and informed Plaintiff that it had two options. Defendant could continue to sell the goods already procured under the Sales Agreement and pay out to Plaintiff as they were sold (*i.e.,* continue the consignment arrangement), which was recommended by Claveau, or the parties could work out a payment plan where Defendant would pay Plaintiff $180,000 for the goods over the course of 12 months. Claveau signed this email "On behalf of PowerRail" and copied multiple employees of Defendant, including Defendant's Director of Supply

Chain, James Fazio, who did not contradict Claveau's offer or authority to act on Defendant's behalf. Plaintiff expressed frustration at the miscommunication but agreed with Claveau's recommendation to continue selling the goods on consignment through Defendant. In responding to Claveau and Defendant's employees Plaintiff also indicated it would help look for buyers interested in purchasing the goods now held by Defendant.

In December 2017, ENR confirmed to Plaintiff that it would have the appropriate letter of credit ready soon and could take delivery of the goods. Plaintiff in turn notified Defendant that they had found a buyer for the goods and began to make arrangements for their shipment from Pennsylvania to Egypt, including by arranging visas for Egyptian inspectors to visit Defendant's site in Duryea. However, on December 28, 2017, when Plaintiff's representative contacted Defendant to confirm the items and quantities of parts transferred from RTC to Defendant, and to request help getting visas for ENR's inspectors, Defendant's President and CEO, Paul Foster, responded that Defendant had no involvement in Plaintiff's transaction with ENR and told Plaintiff to stop contacting his employees. The same day, Plaintiff's representative asked for clarification about this position and for Foster's input on how else it could sell or take possession of the goods procured for it by RTC. Foster responded that he was unaware of any

interest Plaintiff may have in the goods and claimed Plaintiff was misinformed.

As a result, Plaintiff, first through Turkish counsel, on January 8, 2018, and then through American counsel, on March 7, 2018, sent letters to Defendant demanding it deliver the disputed goods to ENR, who had the letter of credit needed to complete the sale as of January 11, 2018. In these letters Plaintiff reiterated that upon delivery it would pay the balance of the Sales Agreement to Defendant. But Defendant still refused to deliver the disputed goods to either Plaintiff or ENR. Plaintiff was unable to find another source of parts for ENR and in early May 2019, ENR declared Plaintiff to be in breach of their 2015 contract and demanded forfeiture of the "guarantee deposit" or performance bond under that contract.

Plaintiff initiated this action on April 16, 2018, alleging that Defendant is liable for RTC's breach of the Sales Agreement because RTC was in fact the Canadian subsidiary/affiliate of Defendant with Defendant's CEO and majority shareholder, Paul Foster, also owning 49% of RTC (the remaining 51% was held by RTC CEO Stephane Claveau). Furthermore, Plaintiff alleges that the closure of RTC and subsequent transfer of the goods to Defendant was the direct result of Foster's actions. In fact, Plaintiff submits evidence that in April 2017 Claveau even tried to sell his majority stake in

RTC to Plaintiff to stop the closure of RTC by Foster. Conversely Defendant, who is 70% owned by Foster (with the remaining 30% held by his employees), argues that it is a distinct corporate entity from RTC, from whom it merely bought the disputed goods without any knowledge of RTC's contract with Plaintiff or Plaintiff's contract with ENR. Defendant further asserts that regardless of the nature of its relationship with RTC Plaintiff has no evidence it ever had title to the goods. It merely made a substantial advanced payment towards those goods that RTC never refunded. Thus, in Defendant's view only RTC, a now defunct entity with no assets, is solely liable for Plaintiff's damages.

## II.  Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the nonmoving party and is material if it will affect the

outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995).

At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *See also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). But the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. *See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *See also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show

sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party must direct the court's attention to specific, triable facts by "citing particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *See United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *See also DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) ("If factual support for [a plaintiff's] claim exist[s] in the record, it [i]s incumbent upon her to direct the District Court's attention to those facts.").

If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *Jakimas v. Hoffman–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

Finally, "[i]nasmuch as Pennsylvania law governs this action[,] we treat Pennsylvania Supreme Court opinions as binding precedent and

Pennsylvania Superior Court opinions as persuasive precedent." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 107 n.2 (3d Cir. 2009).

### III.    Discussion

Defendant claims it is entitled to summary judgment on (1.) Plaintiff's breach of contract count because there is no evidence that it was party to the Sales Agreement; (2.) Plaintiff's unjust enrichment count because this claim is barred by the existence of a contract and because Defendant conferred no benefit on it; (3.) Plaintiff's tortious interference with a business and economic relation count because this claim is also barred by the existence of a contract and because there is no evidence Defendant knew about the Sales Agreement; (4.) Plaintiff conversion count because this claim is barred by the gist of the action doctrine, because Plaintiff consented to the alleged conversion, and because Defendant has superior title to the disputed goods; and (5.) Plaintiff's fraudulent conveyance count because this claim should have been brought under an improperly raised Canadian statute. Furthermore, Defendant disputes Plaintiff's entitlement to punitive damages

and attorney's fees based on some of these claims. The court will address each of these arguments in turn.

### A. Breach of Contract

A plaintiff must generally establish three elements to support a breach of contract claim: (1) "the existence of a contract, including its essential terms"; (2) "a breach of a duty imposed by the contract"; and (3) "resultant damages." *See Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002) (citing *Corestates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). Here Plaintiff does not point to evidence that indicates Defendant was at any point a party to the Sales Agreement between Plaintiff and RTC but does plead three different theories, alter ego, agency, and assumption, for why Defendant was still fully or at least partially bound by the Sales Agreement and therefore breached it by refusing to deliver the disputed goods to Plaintiff or ENR. Since neither party argues or submits evidence that the Sales Agreement contains a forum selection clause, the court applies Pennsylvania law. *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020) (citing *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 136 S. Ct. 463, 468, 193 L.Ed.2d 365 (2015) (We apply the forum's contract interpretation law, unless the contract has a choice-of-law provision.)

### 1. Alter Ego

Pennsylvania law has a strong presumption against piercing the corporate veil. *Lumax Industries, Inc. v. Aultman,* 669 A.2d 893, 895 (Pa. 1995). But courts have held that "[t]he corporate veil will be pierced, and the corporate form disregarded whenever justice or public policy demand, such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1034–35 (Pa. 2018) (citations omitted). One such instance that allows a court to pierce the corporate veil is the alter ego theory which applies "where the individual or corporate owner controls the corporation to be pierced, and the controlling owner is to be held liable." *S.T. Hudson Engineers, Inc., v. Camden Hotel Development Associates*, 747 A.2d 931, 935–36 (Pa. Super. Ct. 2000) (citations omitted). Specifically, the alter ego theory requires proof (1) that the party [or parent corporation] exercised domination and control over corporation; and (2) that injustice will result if corporate fiction is maintained despite unity of interests between corporation and its principal. *Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.*, 53 A.3d 53, 58 n.7 (Pa. Super. Ct. 2012)

However, alter ego theory does not apply to a non-owner of a corporation. *Lozosky v. Keystone Bus. Prods.*, 2015 WL 4727073 (M.D. Pa. August 10, 2015) (citations omitted); *Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 333 n.7 (3d Cir. 2000) ("The alter ego theory comes into play in piercing the corporate veil when one seeks to hold liable an individual owner who controls the corporation.") *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio*, LLC, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004) (Alter ego theory applies only when the "corporate owner controls the corporation to be pierced and the controlling owner is to be held liable."); *Good v. Holstein*, 787 A.2d 426, 430 (Pa. Super. Ct. 2001) (same); *Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 693 (Pa. Super. Ct. 1998)(same).

Plaintiff points to no evidence that Defendant owned any stake in RTC, only that Defendant and RTC share a major individual shareholder, Paul Foster. Instead, Plaintiff argues that in analyzing alter ego claims, control rather than ownership is key. Specifically Plaintiff cites *Copia Commc'ns, LLC v. AMResorts, L.P.*, 2017 WL 4012687, *1, *6 (E.D. Pa. September 8, 2017) (noting that while the alter ego theory "most readily applied in the context of parent/subsidiary relationships between entities," "the [c]ourt's research reveals that in some instances, the alter ego theory may apply in the context of other sorts of corporate arrangements, so long as their

operations and management are sufficiently interconnected.") However, the research cited by the court in *Copia* is a case applying Texas not Pennsylvania law. *See Hunt v. Glob. Incentive & Meeting Mgmt.*, No. CIV.A.09-4921 JBS, 2010 WL 3740808, at *9 (D.N.J. Sept. 20, 2010) (Analyzing Texas alter ego doctrine to determine if court had personal jurisdiction over defendant.) Moreover, the evidence highlighted by Plaintiff of Defendant's control over RTC is actually evidence of Foster's control over RTC. Such evidence could have been used to support an alter ego claim against him, but as pled Foster is not party to this action. Foster may own 70% of Defendant but he is still a legally distinct person from Defendant. Consequently, the court is not persuaded by Plaintiff's arguments regarding control.

Plaintiff also argues that even as a non-owner of RTC, Defendant may be liable under the single-entity theory. Under the single-entity theory "two or more corporations are treated as one because of identity of ownership, unified administrative control, similar or supplementary business functions, involuntary creditors, and insolvency of the corporation against which the claim lies." *See Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. Super. Ct. 1998). At the time the present motion was filed this theory had yet to be adopted in Pennsylvania. *Id*; *See also E–Time Sys., Inc. v. Voicestream*

- 14 -

*Wireless Corp.,* No. CIV.A. 01–5754, 2002 WL 1917697, at *12 (E.D.Pa. Aug. 19, 2002) (declining to apply the single entity theory because it "has yet to be adopted in Pennsylvania"). In July 2021, the Pennsylvania Supreme Court concluded that a narrow form of single-entity or "enterprise liability" may be available under certain circumstances. *Mortimer v. McCool*, 255 A.3d 261, 266 (Pa. 2021). Specifically, the Court found that to pierce the corporate veil under this theory "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice." *Id*. at 286-287. The Court also recognized that alter ego and enterprise liability are different theories because the former applies only to owners whereas the latter can also apply to non-owners. *Id.* at 270.

Here Plaintiff argues the record supports a single entity/enterprise liability theory. Conversely Defendant argues that because Plaintiff explicitly pled its breach of contract claim based on alter ego, agency, and assumption theories, it is impermissibly attempting to amend its complaint by raising an additional theory on summary judgment. A plaintiff is permitted to introduce new facts into the record at the summary judgment stage. *See Twombly*, 550 U.S. at 563 ("[O]nce a claim has been stated adequately, it may be supported

by showing any set of facts consistent with the allegations in the complaint."). However, a plaintiff cannot introduce new legal theories or claims through a brief in opposition to a motion for summary judgment. *See Diodato v. Wells Fargo*, 44 F. Supp. 3d 541, 557 (M.D. Pa. 2014) (quoting *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (non-precedential) ("It is well-settled that [a party] 'may not amend his complaint in his brief in opposition to a motion for summary judgment.'")[1]

Applying this same standard, the court in *Price v. City of Philadelphia*, found that the plaintiff would need to seek leave to amend his complaint in order to pursue an equal protection claim based on a different theory of differential treatment than he pled in his complaint because differential treatment was an element of Plaintiff's equal protection claim and Plaintiff cannot add a new basis for an element at summary judgment. 239 F. Supp. 3d 876, 900 n.17 (E.D. Pa. 2017). Here the existence of a contract is an element of Plaintiff's breach of contract claim and Plaintiff is attempting to add a new basis for that element on summary judgment by arguing Defendant is liable for RTC's breach of the Sales Agreement under a single

---

[1] The court in *Diodato* recognized that *Bell* is a non-precedential decision but was nonetheless persuaded by "the panel's *ratio decidendi* and the policy considerations underlying the same." *Diodato* 44 F. Supp. 3d at 557 n.8 (M.D. Pa. 2014). The court here is likewise persuaded.

entity/enterprise liability theory. Plaintiff cannot boot strap this discreet and unpled theory into its breach of contract claim absent a further amendment to its complaint. Accordingly, because the undisputed facts do not show Defendant had an ownership interest in RTC necessary to make it RTC's alter ego and Plaintiff does not plead single entity/enterprise liability, a reasonable jury could not find Defendant liable for breach of contract on either of those theories.

### 2. Agency

Pennsylvania recognizes four types of authority an agent may possess: (1) express authority; (2) implied authority; (3) apparent authority; and/or (4) authority by estoppel. *Walton v. Johnson*, 66 A.3d 782, 786 (Pa. Super. Ct. 2013). Express authority is found when "the principal deliberately and specifically grants authority to the agent as to certain matters." *Id*., at 786. Implied authority exists in situations where the agent's actions are "proper, usual and necessary" to carry out express agency. *See Passarelli v. Shields,* 156 A.2d 343, 346 (Pa. Super. Ct. 1959). Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. *See Turner Hydraulics v. Susquehanna Construction Co.,* 606 A.2d 532, 534 (Pa. Super. Ct. 1992). Authority by estoppel occurs when

the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal. *See Turnway Corp. v. Soffer,* 336 A.2d 871, 876 (1975).

Plaintiff claims there is a genuine dispute of material fact over whether RTC had apparent authority to act on Defendant's behalf when entering into the Sales Agreement. Specifically, Plaintiff cites (1.) Paul Foster's deposition testimony indicating RTC targeted and marketed to Defendant's international clients like Plaintiff (Doc. 65-6 at 25:3-25, 26:19-27:3, 46:13-47:2; Doc. 65-7 at 25:5-20); (2.) representations on Defendant's website and in its catalog of RTC as one of its facilities (Doc. 65-9); (3.) RTC's employees' use of emails containing Defendant's domain name (Doc. 65-11, Nos. 5 & 9); (4.) RTC use of Defendant's logo (Doc. 65-12 at 130:10-131:3); (5.) RTC and Defendant sharing the same booth at international trade fairs (*Id*. at 128:11-23); and (6.) Defendant's letter to a customer representing RTC as a "subsidiary partner" of Defendant (Doc. 65-8).[2]

---

[2] Plaintiff challenges the probative value and admissibility of Plaintiff's Exhibit 9, the so-called "Inscendo Letter." (Doc. 65-8.) However, Plaintiff cites genuine disputes of material fact about this theory based on other aspects of the record so the court will not address the admissibility of this particular piece of evidence at this stage of the litigation.

Pennsylvania law tilts in favor of finding that an agent has apparent authority. *Bolus v. United Penn Bank*, 525 A.2d 1215, 1222 (Pa. Super. Ct. 1987), *appeal denied*, 541 A.2d 1138 (Pa. 1988). Third parties dealing with an agent need only exercise "reasonable diligence to ascertain the agent's authority." *Id*. Moreover, "[a]n admitted agent is presumed to be acting within the scope of his authority where the act is legal, and the third party has no notice of the limitations on the agent's authority." *Id.* at 1221. In determining the apparent authority of an agent, the court must focus on the actions of the principal, not the agent. *Id.*  A third party like Plaintiff is entitled to believe an agent has authority where a person of ordinary prudence, diligence, and discretion would so believe. *Id.* at 1221 (1987). The nature and extent of an agent's authority is a question of fact for the trier. *Joyner v. Harleysville Insurance Co.,* 574 A.2d 664, 668 (Pa. Super. Ct. 1990), *appeal denied*, 588 A.2d 510 (Pa.1990). Also, the trier-of-fact is to evaluate the conduct of the parties in light of all the circumstances in determining the existence of apparent authority. *Turner Hydraulics, Inc.*, 606 A.2d at 535.

Here Plaintiff submits evidence that raises a genuine dispute of material fact as to whether a person of ordinary prudence, diligence, and discretion would believe, based on the actions of Defendant, RTC was acting as Defendant's agent. Defendant acknowledges that Plaintiff has made

"colorable assertions about logos, email addresses, the trade booth, the catalog page, the website, and the purported "targeting" of international companies." (Doc. 76 at 18.) Under Pennsylvania law such evidence is enough for a jury to find RTC had apparent authority to bind Defendant. *See Mamalis v. Atlas Van Lines, Inc.*, 528 A.2d 198, 199 (Pa. Super. Ct. 1987), aff'd, 560 A.2d 1380 (1989) (Agent had "apparent authority" to bind principal, where agent was allowed to use principal's name and logo for promotional purposes.) But Defendant maintains that Plaintiff's breach of contract claim based on apparent authority theory fails as a matter of law because Plaintiff provides no evidence it entered into the Sales Agreement with RTC understanding Defendant would be in control of it.

Defendant cites binding Pennsylvania Supreme Court precedent that "[t]he basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Bradney v. Sakelson*, 473 A.2d 189, 191 (Pa. Super. Ct. 1984) (quoting *Scott v. Purcell*, 415 A.2d 56, 60 (Pa. 1980)). However, in that same case the Court also recognizes that it is not necessary "to furnish direct evidence of the specific authority if it can be reasonably inferred from the

circumstances of the case. *Scott*, 415 A.2d at 61 n. 8 (citing *Yezbak v. Croce*, 88 A.2d 80, 82 (Pa. 1952)).

Viewing the record in the light most favorable to Plaintiff, the non-movant, as is required on summary judgment, the court finds there is sufficient evidence to reasonably infer from the circumstances of this case that Plaintiff understood Defendant would have ultimate control over the undertaking envisioned by the Sales Agreement. Namely, Plaintiff could have reasonably understood that RTC was merely Defendant's liaison to international clients like itself.

Nonetheless, Defendant further argues that Plaintiff had actual knowledge that RTC was not Defendant's agent because Claveau specifically disavowed Defendant's control over RTC on April 29, 2017, when he also proposed selling his majority stake in RTC to Plaintiff (Doc. 65-13), and in any event that RTC never notified Defendant about the Sales Agreement with Plaintiff. While apparent authority terminates when an agent renounces it, Restatement (Third) of Agency §3.11 (2006), Claveau's renunciation occurred two years after the Sales Agreement was entered into, meaning that it does not affect RTC's initial apparent authority when binding Defendant to the Sales Agreement. Likewise, an agency relationship still exists even if RTC failed to notify Defendant of the Sales Agreement. *See In*

*re Rotavirus Vaccines Antitrust Litig.*, 30 F.4th 148, 156 (3d Cir. 2022) (citing Restatement (Third) of Agency §5.03 cmt. b (Am. L. Inst. 2006). ("A principal may not rebut the imputation of an agent's notice of a fact by establishing that the agent kept silent."). Accordingly, a reasonable jury could find Defendant liable for breach of contract under an agency theory.[3]

### 3. Assumption

Under Pennsylvania law, contracts are assignable and "[w]here an assignment is effective, the assignee stands in the shoes of the assignor and assumes all of his rights." *Smith v. Cumberland Grp., Ltd.*, 687 A.2d 1167, 1172 (Pa. Super. Ct. 1997). Defendant argues that Plaintiff has no evidence that RTC assigned the Sales Agreement, or delegated any part of it, to

---

[3] Defendant also argues that Plaintiff's agency theory fails because there is no evidence Defendant ever received any consideration from Plaintiff and a contract entered into by RTC alone is unenforceable against Defendant under the statute of frauds. It is undisputed RTC received valuable consideration from Plaintiff namely $172,000 and the promise of an additional $172,000 upon delivery of the goods. Under Pennsylvania law consideration to an agent counts as consideration to a principal. *1524 Hamlin Highway, LLC v. Black*, 305 A.3d 1015 (Pa. Super. Ct. 2023) (Granting summary judgment based on lack of consideration only where there was no evidence undisputed recipient of valuable consideration was an agent of Defendant.) So as long its reasonable for the jury to find RTC was Defendant's agent a jury could also reasonably find Defendant received consideration. Similarly, whether RTC was Defendant's agent including with the power to bind Defendant under the statute of frauds remains a question of fact. Thus, these issues are also not dispositive of Plaintiff's agency theory at this stage of the litigation.

Defendant, that Defendant assumed it, that Defendant acted under it, or that Defendant had a copy of it before this lawsuit. Conversely Plaintiff contends that although there was no express assumption of the Sales Agreement, Defendant's actions demonstrate that it assumed the contract. Specifically. Plaintiff highlights that evidence (1.) Defendant was on written and oral notice that the disputed goods belonged to Plaintiff before accepting those goods (Doc. 65-12 at 59:23-63:25; Doc. 65-22) (2.) Defendant assumed RTC's obligations when it offered to pay Plaintiff for the disputed goods and later agreed to sell them on consignment (Doc. 65-12 at 72:11-73:74-8; Doc. 65-25)., and (3.) Defendant assumed other RTC contracts, including by receiving and making payments for RTC. (Doc. 65-31.)

Defendant still argues that there is no evidence it ever indicated to anyone that it would accept an assignment. However, Claveau, explicitly writing on behalf of Defendant, assumed Plaintiff's consignment arrangement with RTC. (Doc. 65-26.) Multiple employees of Defendant including James Fazio, Defendant's Supply Chain Director, were copied on this email chain and did not disavow Claveau as having authority to accept this assignment on Defendant's behalf, thus making Claveau an agent of Defendant by estoppel. *See Turnway Corp.,* 336 A.2d at 876 (Authority by estoppel occurs when the principal fails to take reasonable steps to disavow

the third party of their belief that the purported agent was authorized to act on behalf of the principal.) As a result, there is genuine dispute as to whether Defendant did accept the assignment of at least Plaintiff's consignment terms with RTC.

Even so, Defendant further argues that Plaintiff lacks evidence to prove effective assignment, namely that (1.) RTC's right to payment by Plaintiff was "extinguished" and, (2) that Defendant "acquired" a "similar right" to receive payment from Plaintiff for the disputed goods as required by *Wilcox v. Register*. 207 A.2d 817, 820 (Pa. 1965) (Adopting Restat. 2d of Contracts §317.) According to Defendant there is only evidence that RTC received payment from Plaintiff and kept it for itself (Doc. 55 p.11), and no evidence Defendant ever "acquired" any right to receive payment from Plaintiff for the disputed goods.

However, there is evidence that RTC and Plaintiff modified the Sales Agreement to include consignment terms. A contract can be modified with the assent of both contracting parties if the modification is supported by consideration. *Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 558 (Pa. Super. Ct. 2006) (citing *Wilcox* 207 A.2d at 821). Here Plaintiff allowed RTC to sell the parts procured under the Sales Agreement to other buyers in exchange for the promise or consideration that RTC refund its

advanced payment as those parts were sold. (Doc. 55-6 43:4-46-7.) It was these terms that Claveau later may have assumed on Defendant's behalf.

Under these terms there was no right for RTC or Defendant to receive payment from Plaintiff, only the right to sell the goods Plaintiff already made a 50% advanced payment towards to other buyers in exchange for refunding that advanced payment as the goods were sold. To put it another way, under the consignment terms RTC's right to performance was the right to sell the goods it previously procured for Plaintiff on behalf of ENR to other buyers. That right would have been extinguished not only by Claveau assuming the consignment terms on Defendant's behalf but also by the physical transfer of the disputed goods from RTC to Defendant's possession, through which Defendant acquired the same right held by RTC. Accordingly, a reasonable jury could find Defendant liable for breach of contract under an assumption theory and the court will deny summary judgment on this count.

## B. Unjust Enrichment

Defendant argues that Plaintiff's unjust enrichment claim cannot proceed in the face of a fully executed contract. *See Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) ("By its nature, the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists.") Plaintiff counters that its unjust enrichment claim

- 25 -

is plead in the alternative to its breach of contract claim so, that in the absence of a binding contract Plaintiff can instead seek damages for unjust enrichment. Defendant points to cases where courts have granted summary judgment on unjust enrichment claims because of the existence of a contract. *See e.g., Ruple Builders, Inc. v. Brackenridge Constr. Co.*, No. 2:17-CV-00004, 2019 WL 109329, at *12 (W.D. Pa. Jan. 4, 2019) (Granting defendant's motion for summary judgment on plaintiff's unjust enrichment claim based on the existence of a written agreement.) However, in analogizing to such cases Plaintiff overlooks the fact that in those cases the existence of a contract was undisputed. *See Id*. (Also granting defendant's motion for summary judgment on plaintiff's breach of contract claim.)

Since the court here will not grant Defendant's motion for summary judgment on Plaintiff's breach of contract claim and the existence of a contract remains in dispute, the court will not grant summary judgment on Plaintiff's unjust enrichment claim based solely on the possibility a jury finds a contract existed between the parties. *See Woolley v. Groft*, 653 F. Supp. 3d 171, 186 (M.D. Pa. 2023) (Finding it premature to grant summary judgment where underlying issue of breach of contract remains unresolved.) *See also See Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 190 n.1 (3d Cir. 1977) (explaining a "note of caution about a grant of summary judgment in

circumstances where the facts are unclear and a fuller development of the facts may serve to clarify the application of the law.") Nevertheless, Defendant also challenges the substance of this claim.

For a party to establish a successful claim for unjust enrichment under Pennsylvania law, the following elements are required: "(1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit." *See Global Ground Support, LLC v. Glazer Enters., Inc.*, 581 F. Supp. 2d 669, 675 (E.D. Pa. 2008) (citing *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993), aff'd, 637 A. 2d 276 (Pa. 1994)). Here Defendant argues that Plaintiff has no evidence it conferred a benefit on Defendant.

Conversely Plaintiff argues that it conferred a substantial benefit on Defendant in the form of the disputed goods towards which it had it already made a 50% advance payment. Specifically, it points to aspects of the record namely Claveau's deposition testimony that demonstrate Defendant was aware the dispute goods "belonged" to Plaintiff, and that Defendant refused to deliver the disputed goods to Plaintiff or refund its advance payment. (Doc.

65-12 at 59:23-63:25; 88:18-20; 240:12-23). In its reply to brief Defendant further argues that Plaintiff cannot prove it has title to the disputed goods.

"A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage." Restatement (First) of Restitution §1, comment b. As such a person cannot confer a benefit it does not own. Under Pennsylvania contract law "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." 13 Pa. Stat. and Cons. Stat. Ann. §2401. Here Plaintiff does not point to any part of the record indicating that RTC or Defendant agreed to transfer title over the disputed goods prior to delivery. Moreover, it is undisputed that neither RTC nor Defendant ever delivered the disputed goods to Plaintiff. However, Claveau's deposition testimony indicates that RTC considered the goods it procured for Plaintiff on ENR's behalf as belonging to Plaintiff and told Defendant as much. (Doc. 65-12 at 59:23-63:25; 88:18-20; 240:12-23.)

While Defendant challenges the admissibility of the evidence relied on elsewhere in Claveau's deposition it does not challenge these portions of

testimony specifically cited by Plaintiff. Likewise, Plaintiff's arguments that it paid RTC for the goods (by forgiving its trade debt) is of no moment because as long as Plaintiff's ownership of the goods is genuinely disputed payment for those goods to anyone else does not matter. In the same vein the undisputed fact RTC not Plaintiff delivered the goods to Defendant does not mean Plaintiff did not confer the benefit of those goods, because it is undisputed that transfer occurred pursuant to Plaintiff's authorization. Accordingly, a reasonable jury could find Defendant was unjustly enriched and the court will deny grant summary judgment this count.

## C.   Tortious   Interference   with   a   Business   or   Economic Relationship

Defendant argues that by averring it is bound under the Sales Agreement, Plaintiff does not state that there is a "third party" against whom its tortious interference claim can lie. *Daniel Adams Assocs., Inc. v. Rimbach Pub.*, Inc., 519 A.2d 997, 1000 (Pa. Super. Ct. 1987) (Existence of a contractual relationship between plaintiff and third party other than the defendant required). Again, Plaintiff argues that this claim is pled in the alternative to its breach of contract claim and the issue of breach of contract between the parties remains unresolved. As such, it would also be premature to grant summary judgment on this claim solely based on the possibility a

jury may find the parties were bound by contract. Nevertheless, Defendant also challenges the substance of this count.

To establish a claim for tortious interference with business relations under Pennsylvania law a plaintiff must show (1) a contractual or prospective contractual relation; (2) the purpose or intent to harm the existing or prospective relation; (3) the absence of privilege or justification on the part of the defendant; and (4) actual damage to plaintiff as a result of the defendant's conduct. *Pawlowski v. Smorto*, 588 A.2d 36, 39 (Pa. Super. Ct. 1991). Here Defendant argues Plaintiff cannot prove an unprivileged act by Defendant, Defendant knew about Plaintiff's contract with RTC, Defendant stopped RTC from delivering the goods, or Defendant knew about Plaintiff's separate contract with ENR.

In its brief in opposition Plaintiff—without citing any piece of evidence— claims Defendant's acts were unprivileged because the record shows Defendant knew the disputed goods belonged to Plaintiff, still took possession of those goods, and then refused to allow RTC to deliver them to Plaintiff, in violation of the Sales Agreement. By not citing any part of the record this bald assertion fails to raise any genuine dispute of material fact. The court is under no obligation to search out evidence in either party's favor. *See DeShields* 463 F. App'x at 120 (3d Cir. 2012) ("If factual support for [a

plaintiff's] claim exist[s] in the record, it [i]s incumbent upon her to direct the District Court's attention to those facts.") Regardless there is no evidence RTC ever attempted to deliver the goods let alone evidence Defendant stopped them from making delivery. There is evidence that Claveau attempted to help facilitate the delivery of the goods from Defendant to ENR but there is no evidence he was attempting to do so on behalf of RTC. Plaintiff points to no other evidence that even if Defendant knew the goods belonged to Plaintiff and took possession of them, they did anything to interfere with the Sales Agreement.[4] Accordingly, a reasonably jury could not find Defendant tortiously interfered with a business or economic relation of Plaintiff and the court will grant summary judgment on this count.[5]

---

[4] Defendant also claims that by September 2017 RTC no longer had a contractual duty to deliver the goods to Plaintiff and thus it cannot be held liable for any subsequent interference. *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1988) (Plaintiff must prove purposeful action specifically intended to harm "existing" contractual relation). Conversely Plaintiff responds that RTC continued to have the obligation to deliver the ENR goods at least until it identified an alternative buyer, which had not happened as of December 2017. But again, Plaintiff does not cite any evidence in the record to support this argument and even if it did, this count would still fail based on the above reasons.

[5] It is unclear based on the amended complaint whether Plaintiff is also alleging Defendant interfered with the contract between it and ENR. However, in opposing the present motion Plaintiff only argues Defendant tortiously interfered with the Sales Agreement and does not challenge Defendant's argument that it was unaware of Plaintiff's separate agreement with ENR. As such a claim of tortious interference with that separate contract

*(footnote continued on next page)*

### D. Conversion

"Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification." *Pittsburgh Const. Co. v. Griffith,* 834 A.2d 572, 581 (Pa. Super. Ct. 2003) (citing *Chrysler Credit Corp. v. Smith,* 643 A.2d 1098, 1100 (Pa. Super. Ct. 1994)). The elements of a claim for conversion under Pennsylvania Law are: (1) the deprivation of another's right in, or use or possession of, property, (2) without the owner's consent, and (3) without lawful justification. *Bernhardt v. Needleman,* 705 A.2d 875, 878 (Pa. Super. Ct. 1997)

Here Defendant argues that Plaintiff's conversion claim is barred by the gist of the action doctrine. *Berger & Montague, P.C. v. Scott & Scott*, *LLC*, 153 F. Supp. 2d 750, 753 (E.D. Pa. 2001) ("Under Pennsylvania law, tort claims allegedly committed in the course of carrying out a contract are dismissible if the 'gist' of them sounds in contract instead of tort.") Claims sound in contract if they arise from "the breach of duties imposed by mutual consensus." *Phico Ins. Co. v. Presbyterian Medical Serv. Corp.,* 663 A.2d

---

is deemed abandoned or waived. *See Campbell v. Jefferson Univ. Physicians*, 22 F.Supp.3d 478, 487 (E.D. Pa. 2014) ("Where a nonmoving party fails to address the "substance of any challenge to particular claims, that failure 'constitutes an abandonment of [those] causes of action and essentially acts as a waiver of [those] issues.'").

753, 757 (Pa. Super. Ct. 1995). By contrast, tort claims arise "from the breach of duties imposed as a matter of social policy." *Id.*

Conversely Plaintiff claims that Defendant's reference to the gist of the action doctrine is a "red herring" and its conversion claim is not connected to any of its contract claims because it arises only if a jury finds it has no contract claim. However, the court disagrees. It is settled in Pennsylvania that possession of a chattel is deemed to be *prima facie* evidence of ownership. *Leitch v. Sanford Motor Truck Co.*, 279 Pa. 160, 123 A. 658 (1924). Thus, any person claiming ownership of property which is in the possession of another bears the burden of proving facts essential to his claim of ownership. *In Re Carr's Estate*, 371 Pa. 520, 92 A.2d 213 (1952).

Plaintiff's right to the disputed and allegedly converted goods is based on the Sales Agreement. Absent this contract Plaintiff cannot meet its burden and prove an ownership interest in goods that were never in its possession. As a result, Plaintiff's conversion count ultimately sounds in contract and is barred by the gist of the action doctrine. See *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. Ct. 2003) (Juries should not be charged on conversion where that claim depends entirely on obligations defined in contract.) Accordingly, a reasonable jury could not find Defendant converted the disputed goods and the court will grant summary judgment on this count.

### E. Fraudulent Conveyance

In its amended complaint Plaintiff initially brought a fraudulent conveyance claim pursuant to the Pennsylvania Uniform Voidable Transactions Act ("PUVTA"). On January 17, 2020, Plaintiff gave Defendant written notice that its fraudulent conveyance claim may be governed by Ontario law, namely Ontario's Fraudulent Conveyances Act ("FCA"), rather than the PUVTA. The parties subsequently agreed by stipulation that all references in the amended complaint to the PUVTA be deemed withdrawn but Plaintiff's fraudulent conveyance claim would otherwise remain intact. (Doc 52.) However, in support of the present motion Defendant argues that Plaintiff's fraudulent conveyance count's elements and remedies constitute an unauthorized PUVTA claim which must be dismissed.

Defendant argues Plaintiff cannot pursue a PUVTA claim because the debtor under that claim, RTC, is Canadian. The PUVTA includes a choice of law provision whereby "the local law of the jurisdiction in which the debtor is located when the transfer is made, or the obligation is incurred" is the governing law for a claim for relief. *See Warren Hill, LLC v. Neptune Invs., LLC*, No. CV 20-452, 2020 WL 7353306, at *3 (E.D. Pa. Dec. 15, 2020) (citing 2 Pa. C.S. §5110(b).) When the debtor is an organization, as is the case here, its location is its place of business. *See* 12 Pa. C.S. §5110(a).

- 34 -

Since RTC was located in St. Thomas, Ontario, Canada, the governing law of Ontario applies pursuant to the PUVTA. However, Defendant also argues that it did not have adequate notice Plaintiff intended to raise foreign law.

Defendant asserts that Plaintiff filed its PUVTA claim 18 months after the start of this case and over 3 months later on January 17, 2020, it only gave Defendant notice it "may" pursue its fraudulent conveyance claim under Ontario law. According to Defendant this "may" did not give it adequate notice under Federal Rule of Civil Procedure 44.1, which governs the application of foreign law in this court, because January 31, 2020, was the close of discovery, February 7, 2020, was the deadline for pleading amendments, and February 28, 2020, was the deadline for filing the present motion. Under Rule 44.1 "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." Defendant correctly cites the 1966 advisory committee notes comment that:

> The stage which the case had reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue of foreign law sought to be raised, are among the factors which the court should consider in deciding a question of the reasonableness of a notice.

Fed. R. Civ. P. Adv. Comm. Note Rule 44.1. But Defendant fails to cite the sentence immediately before this comment that the rule "does not attempt to set any definite limit on the party's time for giving the notice of an issue of foreign law; in some cases, the issue may not become apparent until the trial and notice then given may still be reasonable." *Id.*

Regardless, Defendant is correct in pointing out that Plaintiff does not proffer a reason for its failure to give earlier notice. Plaintiff only argues that the elements of a claim under the Ontario FCA are similar to the elements of the PUVTA, so there is no prejudice to Defendant as a result of the change, and other courts have liberally construed the notice requirement of Rule 44.1. In support of this argument Plaintiff cites two cases: *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venezuela*, 575 F.3d 491, 497 (5th Cir. 2009) and *APL Co. Pte. v. UK Aerosols Ltd.*, 582 F.3d 947, 956 (9th Cir. 2009). However, in *Northrop Grumman* the Fifth Circuit allowed delayed notice under Rule 44.1 because the moving party did not allege it was prejudiced by the delay, the party invoking foreign law first referenced the applicability of that foreign law two years prior to its actual Rule 44.1 notice, and five months passed between the actual Rule 44.1 notice and the motion at issue. Likewise in *APL* the Ninth Circuit specifically evaluated the reason proffered by the party raising foreign law for its failure to give earlier notice

and determined there was no need to give earlier notice under the rule because foreign law was not previously an issue before the court.

Here Defendant alleges it would be prejudice by the application of foreign law because the Ontario FCA contains different remedies than the PUVTA.[6] Moreover, Plaintiff never even filed a formal Rule 44.1 notice, it merely referenced the possible applicability of foreign law six weeks before the present motion was due. Likewise, Plaintiff proffers no explanation for its failure to give earlier notice that the court may evaluate, nor could it argue the issue of foreign law did not arise until January 17, 2020. Plaintiff knew or reasonably should have known from the onset of this litigation that RTC was located in Ontario and the law of that jurisdiction would be implicated in a fraudulent conveyance claim. As such Plaintiff's failure to give earlier notice was not reasonable under rule 44.1 and the court will not apply Ontario law.

Plaintiff cites persuasive authority for applying Pennsylvania law in lieu of dismissing its fraudulent conveyance count. *See Harris v. Kellog, Brown & Root Servs., Inc.*, 796 F. Supp. 2d 642, 654 (W.D. Pa. 2011) (denying

---

[6] Defendant argues that it would be prejudiced by the fact the Ontario FCA does not allow punitive damages like under the PUVTA. This lack of punitive damages would seem to make the Ontario FCA more favorable to Defendant. However, prejudice aside Plaintiff's failure to give earlier notice about the applicability of the Ontario FCA was still unreasonable under Rule 44.1.

application of foreign law and applying forum law).[7] But to do so the court would not only have to completely disregard the choice of law provision in PUVTA, which requires the application of Ontario law, but also the parties' stipulation removing all references to the PUVTA from the amended complaint. "It is a well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside." *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998) (quoting *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 307 (3d Cir. 1972), *partially overruled on other grounds en banc by Kershner v. Mazurkiewicz,* 670 F.2d 440, 448 (3d Cir. 1982)). Plaintiff does not dispute that it freely and fairly stipulated to remove all references to the PUVTA from its amended complaint. The court can discern no other purpose for this stipulation then to preclude application of the PUVTA to Plaintiff's fraudulent conveyance claim and as such will not apply the forum law to this claim.[8] With applicable foreign

---

[7] Plaintiff does not cite relevant binding authority on this issue that holds "where the parties fail to carry [the burden of raising an issue of foreign law] the court will ordinarily apply the apply the forum's law." *Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd.,* 181 F.3d 435, 441 (3d Cir.1999). However, the instant case is not ordinary in that the parties by stipulation have explicitly withdrawn all references to the forum's applicable law.

[8] The court further notes that the parties' stipulation also bars the applicability of PUVTA's choice of law provision and neither the stipulation nor the amended complaint otherwise raise the Ontario FCA. On this basis alone the court could also dismiss Plaintiff's fraudulent conveyance count.

*(footnote continued on next page)*

law barred by Rule 44.1 and applicable domestic law barred by stipulation a reasonable jury could not find Defendant liable for fraudulent conveyance. Accordingly, the court will grant summary judgment on this count.

### F. Punitive Damages and Attorney's Fees

Plaintiff claims that it is entitled to punitive damages and attorney's fees from Defendant relating to its conversion and tortious interference counts. However, as previously stated Defendant is entitled to summary judgment on both those counts. Accordingly, a reasonable jury could not award Plaintiff punitive damages and attorney's fees and the court will dismiss claims to such relief from this case.[9]

### IV.   Conclusion

Based on the aforesaid Defendant's motion for summary judgment will be **DENIED** as to Counts I and II and **GRANTED** as to Counts III, IV, and V.

---

*See e.g., Massi v. City of Philadelphia*, No. CIV.A. 12-1309, 2013 WL 1194643, at *4 (E.D. Pa. Mar. 25, 2013) (Dismissing claim for statutory relief that did not specify the statute that gives rise to such relief.)

[9] In its amended complaint Plaintiff also seeks punitive damages for fraudulent conveyance under the PUVTA. However, Plaintiff does not argue punitive damages on this count here, presumably because such damages are not authorized under the Ontario FCA. *See Pucaru v. Seliverstova et al.*, 2015 ONSC 6679, para. 108 (Can. Ont. Sup. Ct. J.) (Acknowledging "consistently applied" authority "from the Supreme Court of Canada" that holds "damages are not available for breach of the [Ontario FCA] statute.").

The latter counts and Plaintiff's claim for punitive damages and attorney's fees will be **DISMISSED** from the case and trial will be promptly scheduled on the remaining counts. An appropriate order follows.


                                              *s/ Malachy E. Mannion*
                                              **MALACHY E. MANNION**
                                              **United States District Judge**

**DATE: March 25, 2024**
18-821-01